## IN THE UNITED SATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

Sean Stearns,

       Plaintiff - Appellant

                        **Case Number**: 23-3448
                        **Agency Case Number:** 4:21-cv-00662-HFS

v.

Don Wagner, Board of Police Commissioners of Kansas City/ Commissioner

       Defendant

Cathy Dean, Commissioner; Mark Tolbert, Commissioner; Quinton Donald Lucas, Mayor/ Board Member

       Defendants - Appellees

Richard Smith, Police Chief of Kansas City Missouri; David V. Kenner, Board Member; City of Kansas City, Missouri

       Defendants

Dawn Cramer, Commissioner; Jeffrey Spire, Trooper Defendants –

       Appellees

---

Appeal from U.S. District Court for the Western District of Missouri – Kansas City
(4:21-cv-00662-HFS)

---

## APPELLANT'S OPENING BRIEF

                    James T. Thompson   MO #37245
                    Edelman & Thompson, LLC
                    4520 Main Street, Suite 500
                    Kansas City, Missouri 64111
                    Tel: (816) 561-3400
                    Fax: (816) 561-1664

# SUMMARY OF THE CASE

On May 30, 2020, after the death of George Floyd, sizable protests took place in Kansas City, Missouri. Sean Stearns and Ms. Sydney Ragsdale, attended to show their support to members of minority communities. To assist in responding to the protests, Kansas City Police requested assistance of other law enforcement agencies, including the Missouri State Highway Patrol.

Around 11:30 p.m., responders decided to disperse the crowd and during the dispersal, Ms. Ragsdale sustained a head injury which disoriented and disabled her. While rendering aid and continuing a retreat from the police line, the pair knelt by a tree in a park. As he continued to render aid to Ms. Ragsdale, Sean Stearns was struck in the eye by a projectile fired from the direction of the police line. Ultimately, this impact caused Sean to lose his eye. Many of the relevant facts leading up to this incident were captured on video by a Missouri State Highway Patrol videographer. After analyzing video taken by the Missouri State Highway Patrol, substantial evidence exists (albeit disputed) that Appellee Spire fired the munition that took Sean Stearn's eye.

All Appellees filed Motions for Summary Judgment defending generally under both qualified and official immunity. The District Court issued its Memorandum and Order granting both Motions for Summary Judgment. Appellant then initiated this appeal and respectfully requests oral argument of 15 minutes.

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ................................................... 2

STATEMENT OF THE CASE ............................................... 3

SUMMARY OF THE ARGUMENT .................................................... 8

ARGUMENT

    A. Appellee Spire is not entitled to qualified immunity from Appellant's § 1983 claims. ..................................................................................... 9

        1. Jeffrey Spire unpersuasively argues that because Appellant cannot be certain that Jeffrey Spire's munition blinded him, then there is no violation of a constitutional right. ....................................................... 10

        2. Appellee Spire is not entitled to qualified immunity for Appellant's First Amendment retaliation claims (Count I & II). ..................................... 13

        3. Appellee Spire does not have qualified immunity from Appellant's Fourth and Fourteenth Amendment excessive force claims. ............................ 20

    B. Appellee Spire is not entitled to official immunity from Appellant's Missouri State claims (Count VI). ............................................................. 26

    C. The Police Board is not entitled to Summary Judgment on Appellant's Monell claims. ................................................................................... 27

        1. The Police Board's polices and procedures were deficient................... 28

        2. The Police Board's failure to train ........................................ 33

CONCLUSION ................................................................ 37

Appellate Case: 23-3448     Page: 3     Date Filed: 01/22/2024 Entry ID: 5355504

# TABLE OF AUTHORITIES

Cases

*Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996)..........................................33

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).......31

*Bernini v. City of St. Paul*, 665 F.3d 997, 1007 (8th Cir. 2012)...........................2, 14

*Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003)

.......................................................................................................................................28

*Dundon v. Kirchmeier* 577 F.Supp.3d 1007, 1061 (D.N.D 2021). ..........................20

*Green v. City of St. Louis*, 52 S.4th 734 (8th Cir. 2022). ........................................16

*Jordan v. NUCOR Corp.*, 295 F.3d 828, 834 (8th Cir. 2002). .......................9, 26, 27

*Kasiah v. Crowd Systems*, Inc., 915 F.3d 1179, 185 (8th Cir. 2019).........................26

*Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir. 1999).......................9, 26, 28

*Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)...............................2, 28

*Morgan v. Robinson*, 920 S.3d 521, 523 (8th Cir. 2019)............................................9

*N.S. by and through Lee v. Kansas City Bd of Police Comm'rs*, 35 F.4th 1111, 1114

(8th Cir. 2022)................................................................................................................2, 9

*Naucke v. City of Park Hills*, 284 F.3d 923 (8th Cir. 2002). ...................................14

*Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012) ..................................2, 24

*Parrish v. Ball*, 594 F3d 993, 997-98 (8th Cir. 2010).........................................2, 33

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)....................................................2, 9

iii

*Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014). ......................................14, 19

*Quraishi v. St. Charles County, Missouri*, 996 F 3d 831, (8th Cir. 2021). ........18, 19

*Rosales v. County of Los Angeles*, 650 Fed.App'x. 546, 548 (9th Cir. 2016).........10

*Tirado v. City of Minneapolis*, 521 F.Supp.3d 833, 842 (2021)......................2, 30,31

*Truong v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016). ..............................................20

<u>Rules and Statutes</u>

Fed.R.Civ.P. 56(c). ......................................................................................9, 26, 28

42 U.S.C. § 1983 .......................................................................................................1

Mo. Rev. Stat. § 574.060.1 .....................................................................................14

Appellate Case: 23-3448     Page: 5     Date Filed: 01/22/2024 Entry ID: 5355504

# JURISDICTIONAL STATEMENT

The District Court possessed jurisdiction over this action because Appellant's original Petition contained federal claims pursuant to 42 U.S.C. § 1983 (App. 15-66 R. Doc, 1 at 1)[1].

On October 5, 2023, the District Court issued its Order granting summary judgment to all Appellees (App. 1476-1479 R. Doc, 115 at 1-4.). On October 5, 2023, the Clerk of the Court entered Judgment based upon the summary judgment Order. (App. 1480-1481 R. Doc, 116 at 1-2.). The District Court's Order and Judgment disposed of all issues in this case. On November 3, 2023, Plaintiff-Appellant filed his Notice of Appeal. (App. 1482-1483 R. Doc, 119 at 1-2.).

The United States Court of Appeals for the Eighth Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291 which provides for jurisdiction when there is a final judgment from a United States District Court.

---

[1] References to the Joint Appendix are designated (App. __ R. Doc, __ at __.).

**STATEMENT OF ISSUES**

I.     **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO JEFFREY SPIRE ON THE BASIS OF ITS ERRONEOUS CONCLUSION THAT JEFFREY SPIRE WAS ENTITLED TO BOTH QUALIFIED AND/OR OFFICIAL IMMUNITY.**

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

*N.S. by and through Lee v. Kansas City Bd of Police Comm'rs*, 35 F.4th 1111 (8th Cir. 2022)

*Bernini v. City of St. Paul*, 665 F.3d 997, 1007 (8th Cir. 2012)

*Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012)

II.     **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO KANSAS CITY, MISSOURI, BOARD OF POLICE COMMISSIONERS[2] ON THE BASIS OF ITS ERRONEOUS CONCLUSION THAT APPELLANT CANNOT ESTABLISH A *MONELL* CLAIM.**

*Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)

*Tirado v. City of Minneapolis*, 521 F.Supp.3d 833, 842 (2021)

*Parrish v. Ball*, 594 F3d 993, 997-98 (8th Cir. 2010

---

[2] Hereinafter, Kansas City, Missouri, Board of Police Commissioners will be "The Police Board"

2

## STATEMENT OF THE CASE

This action involves constitutional claims asserted by Sean Stearns arising from injuries he suffered while at a protest following the death of George Floyd.

On May 25, 2020, George Floyd tragically died while in the custody of the Minneapolis Police Department triggering widespread demonstrations across the country. Sean Stearns attended the protests with his partner Sydney Ragsdale to show support for the cause generally but also for the victims/families/communities affected by police violence and brutality. (App. 609 R. Doc, 90-10 at 4.)[3]. Sean first arrived at the Plaza around 2:00 or 3:00 in the afternoon, but then went home to eat dinner. Because the protests were ongoing, he and his partner returned to the Plaza sometime between 9:00 and 10:00 p.m. to continue to show their support. During the protest, between 11:30 p.m. and midnight, the responding officers decided to disperse the crowd. The tactical goal was "having the street cleared by either having [protestors] dispersed – go home for the night or go back into the park." (App. 921 R. Doc, 101-3 at 15).[4]

In attempting to disperse into the park, as the protesters were allegedly told to do, although video of the event does not evidence any such directive or command, Ms. Ragsdale fell and got kneed in the head. In order to protect Ms. Ragsdale from

---

[3] Deposition of Appellant, 9:19 – 10:12.
[4] Deposition of Major Daniel Gates, 49:16-20.

3

further injury and to render aid, Sean set her up under a tree in the park where they were allegedly told to disperse. Ms. Ragsdale's back was faced to the police line (she was sitting up behind a tree in order for the tree to protect her from any munitions used by law enforcement), and Appellant Stearns was crouching faced towards the southwest and the police line. While rendering aid, Sean was struck in the eye by something fired from the direction of the police line as that is the direction his eyes and body were facing when he was hit. The object that hit him came at him diagonally from where he was positioned. (App. 612 R. Doc, 90-10 at 7).[5] The diagonal perspective would be corroborated by video taken by the Missouri Highway Patrol documenting Appellee Spire's discharge of the "scat" multi-projectile round, fired in a manner inconsistent with written MSHP policy directive, that created aerial deployment into the crowd. The video can be analyzed and what is clear is one projectile's smoke trail tracks into the area Sean was in at the very time he was grievously injured. During the protests that night, Appellee Spire deployed three canisters of Riot CS smoke hand grenades, one canister of White Smoke hand grenade, two 40MM Riot CS Smoke Multi-Projectile rounds, one White Smoke Multi-Projectile round, and thirteen less lethal bean bag rounds. (App. 193 R. Doc, 90-1 at 8).[6] Appellee Spires' Use of Force Report[7] indicates him firing

---

[5] Deposition of Appellant, 24:3-12
[6] Appellee Material Fact 53.
[7] Use of Force Report (App. 396-398 R. Doc, 90-4 at 1-3)

4

a 40MM Riot CS Smoke 3 projectile by skipping it at approximately the same time video evidence shows this being done. (App. 190 R. Doc, 90-1 at 5)[8]. The projectile then arced into the retreating crowd, striking Sean Stearns.

The only Use of Force Report from any law enforcement agency which indicates the use of this munition at the time Sean was struck is the report authored by Appellee Spire. In the thirty (30) minutes leading up to Sean's injury video was taken by official Missouri State Highway Patrol scribes/videographers, which documents the scene, including the discharge of the round which most likely struck Sean Stearns. (App. 797 R. Doc, 95-5 at 1.).

Of great import, is the "Use of Force" form filled out by Appellee Spires which indicates that the protesters were in the process of withdrawing consistent with the alleged commands and prior use of force such that they had "…got past our throwable range, (of handheld CS Smoke grenades)". As a result, Appellee Spire "…deployed a 40 MM Riot CS smoke 3 projectile shell….to further disperse the crowd." (App. 397 R. Doc, 90-4 at 2.).

At the time Appellee Spire engaged in the continued, and unjustified use of "less lethal" force into a retreating and panicked crowd, he knew the ordinance could cause serious injury or death. (App. 222 R. Doc, 90-3 at 22.).[9] In fact, the after-action

---

[8] Appellee Material Fact 25.
[9] Deposition of Appellee Spire, 22:6-10.

Appellate Case: 23-3448     Page: 10     Date Filed: 01/22/2024 Entry ID: 5355504

investigation of the Missouri Highway Patrol is particularly damning of Appellee's actions and the reasons why such deployment is extremely dangerous, and legally unconstitutional. In regard to the manner of deployment used by Appellee Spire, a trained instructor for the Missouri State Highway Patrol stated:

A. The scat round should only be deployed in that manner if the rounds land beyond the crowd;[10]

B. If you hit someone in the eye with one of those "little metal things" you'll take their eye out;[11]

C. You would only deploy such rounds behind a crowd if you wanted the crowd to move towards the police line. (Exactly the opposite of what law enforcement purportedly wanted on May 30, 2020).[12]

D. 40 mm rounds should NOT be skipped off the ground intentionally.[13]

Appellant Sean Stearns filed suit against a number of Defendants. After Motions to Dismiss were filed and eventually granted for some of the Defendants, the District Court allowed Appellant's case to proceed against Jeffrey Spire on

---

[10] Mo. State Hwy Patrol Investigative Summary Report (App. 872 R. Doc, 101-1 at 6.)

[11] Mo. State Hwy Patrol Investigative Summary Report (App. 872 R. Doc, 101-1 at 6.)

[12]Mo. State Hwy Patrol Investigative Summary Report (App. 872 R. Doc, 101-1 at 6.)

[13] Mo. State Hwy Patrol Investigative Summary Report (App. 872 R. Doc, 101-1 at 6.)

Counts I (First Amendment- Freedom of Speech and Assembly and First Amendment- Retaliation), II (Violation of Rights Guaranteed under the Missouri Constitution), IV (Use of Excessive Force in Violation of the Fourth and Fourteenth Amendments), and VI (Assault and Battery). The Court also allowed Appellant to proceed with Count III *Monell* Claim against The Police Board.

After substantial discovery took place, Appellees filed separate Motions for Summary Judgment. Jeffrey Spire filed his Motion for Summary Judgment on December 9, 2022. (App. 164-166 R. Doc, 89 at 1-3.). The Police Board filed its Motion of Summary Judgment on December 6, 2022. (App. 67-73 R. Doc, 87 at 1-7.). Given the holiday season, the District Court granted Appellant's requested extensions to file his response to both motions. Appellant responded to Jeffrey Spire's Motion on January 13, 2023. (App. 847-866 R. Doc, 101 at 1-20). Appellant responded to The Police Board's Motion on January 10, 2023. (App. 739-756 R. Doc, 95 at 1-18). On October 5, 2023, the District Court granted Appellees' Motions "based on the reasons and authorities stated by them, but with additional brief explanation" and Ordered the Clerk of the Court to enter Judgment consistent with the Memorandum and Order. (App. 1476-1479 R. Doc, 115 at 1-4.). On November 3, 2023, Appellant filed his Notice of Appeal. (App. 1482-1483 R. Doc, 119 at 1-2.).

## SUMMARY OF THE ARGUMENT

The District Court erred in concluding that Jeffrey Spire was entitled to either qualified and/or official immunity for all of Appellant's claims against him. Particularly, the District Court erred in its finding that retaliatory actions towards a group do not suffice in a Free Speech retaliatory claim, and that being injured by a bean bag shooting does not constitute excessive force under both the Fourth and Fourteenth Amendments.

Additionally, the District Court erred in its conclusion that Appellant's *Monell* Claims against The Police Board fail as a matter of law because Appellant's claims against Jeffrey Spire fail.

8

**<u>ARGUMENT</u>**

The Court of Appeals reviews a grant of summary judgment de novo; after reviewing the record in the light most favorable to the nonmoving party, the Court will affirm the decision if there are no genuine issues of material fact. *Jordan v. NUCOR Corp.*, 295 F.3d 828, 834 (8th Cir. 2002). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir. 1999); Fed.R.Civ.P. 56(c).

**A. Appellee Spire is not entitled to qualified immunity from Appellant's § 1983 claims.**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In determining whether an officer is entitled to qualified immunity, the Court must answer two questions. First, whether the officer's actions violate a constitutional right. Second, was that right clearly established? *N.S. by and through Lee v. Kansas City Bd of Police Comm'rs*, 35 S.4[th] 1111, 1114 (8th Cir. 2022) paraphrasing *Morgan v. Robinson*, 920 S.3d 521, 523 (8th Cir. 2019). "[I]f the answer to either question is no, [the officer] gets immunity." *Id*. As fully briefed below, neither question can be answered in the

9

negative and thus the District Court erred in concluding Jeffrey Spire was entitled to qualified immunity.

      **1. Jeffrey Spire unpersuasively argues that because Appellant cannot be certain that Jeffrey Spire's munition blinded him, then there is no violation of a constitutional right.**

Section a. of Jeffrey Spire's Motion for Summary Judgment is entitled "I don't know what hit me." Appellee Spire seems to hang his hat on the argument that because Sean Stearns is unable to identify the specific object that blinded him, his claims against Appellee Spire fails. However, that is not the law. This Court need not simply accept what may be a self-serving account of the events [by Appellee Spire] but must also look at the circumstantial evidence that if believed would support Appellant's claims. *Rosales v. County of Los Angeles*, 650 Fed.App'x. 546, 548 (9th Cir. 2016). It is a jury who should decide whether to credit the circumstantial evidence. *Id*. In fact, specifically found by the District Court is that "The Spire contention that his firing of a non-lethal but very dangerous projectile (a 40MM Riot CS Smoke 3-projectile weapon) was not the action that injured Stearns is quite debatable. . ." (App. 1477 R. Doc, 115 at 2.).

The evidence, although circumstantial, indicates that Appellee Spire fired a 40MM CS Smoke 3 projectile at 11:47. This is stated on his Use of Force Report that he had written "some days later." (App. 249 R. Doc, 90-3 at 49.).[14] Appellee

---

[14]  Deposition of Appelleee Spire, 49:13

Appellate Case: 23-3448    Page: 15    Date Filed: 01/22/2024   Entry ID: 5355504

Spire indicated that he fired this munition by skipping it off of the ground. (App. 190 R. Doc, 90-1 at 5.). A video, with almost an exact time match to the Use of Force Report (within 40 seconds), shows this type of munition being skipped off of the ground. The angle of the skipped shell, via video evidence, is headed diagonally towards the park where Appellant was rendering aid to Ms. Ragsdale. The park in which protesters were allegedly told to disperse. (App. 921 R. Doc, 101-3 at 15.).[15] At the time the munition was fired, you cannot see anything else being thrown in the area where Sean and Ms. Ragsdale were when he was blinded. Protestors were "out of throwable range" thus indicating that they posed no threat when Appellee Spire fired this munition. (App. 243 R. Doc, 90-3 at 43.).[16]

Appellee Spire offers the argument in support of his position that because Sean Stearns did not suffer burns, he could not have been hit by this munition. Appellee Spire bases this argument on their expert Lieutenant Scott Ballard's ("Ballard") report, testimony, and affidavit. However, Ballard has acknowledged that he has never treated anyone with a thermal injury associated with chemical munitions striking them and has no training in burns or thermal injuries (App. 409 R. Doc 90-6 at 10 & 15).[17] Ballard has also acknowledged that his opinion: "I would expect if Mr. Stearns was struck in the face by one of the projectiles fired by Corporal

---

[15] Deposition of Major Daniel Gates, 49:16-20
[16] Deposition of Appellee Spire, 43:19
[17] Deposition of Scott Ballard, 36:7-11 & 55:14-20

11

Spires, he would have suffered some [type] of burn injury" is based on a personal, and factually distinct, burn he suffered to his fingers after he attempted to pick up a munition that had finished burning after its approximately thirty (30) second burn time. Ballard also acknowledged that the longer something burns the hotter it gets, that he did not try to ascertain the temperature of the munition within seconds after it was fired; that he used a forehead thermometer with a maximum temperature of 106 degrees Fahrenheit when attempting to get a temperature after the munition had completed burning; that Appellant would've been struck within seconds of the munition being fired, and that it would have come into contact with Appellant's skin for milliseconds due to it being a glancing blow, i.e. not lodged in Appellant's body. (App. 408-414 R. Doc, 90-6 at 9-15.).[18] Lastly, Ballard stated that his burns/blisters appeared "not within seconds. But within – within hours." (App. 414 R. Doc, 90-6 at 15.).[19] Yet, for some reason he expected Appellant's burn injuries to appear immediately, or at least within the 15 minutes between getting hit and the time in which Appellant got to the hospital. In other words, Spire can offer absolutely no evidence showing Sean would have sustained a burn after getting struck by this munition because the facts and circumstantial evidence around Sean's injury do not support a conclusion that Appellant would have been burned.

---

[18] Deposition of Scott Ballard, 32:21-22, 34:5-9, 39:13-24, 51:23-25, 52:1-3, 53:21-24
[19] Deposition of Scott Ballard, 53: 10-16

Ballard also states that this type of munition could not have hit Sean because in his experience of testing fired rounds, this munition does not travel higher than waist level. This entirely ignores video evidence showing that the shells did travel higher than the waist. In other words, the video shows what it shows, regardless of if Ballard was able to replicate the trajectory in his few attempts to recreate the shot. (App. 934 R. Doc, 101-4 at 4.).

While Appellee is more than welcome to argue that something from another protestor blinded Sean Stearns; Sean Stearns will certainly be able to offer more than enough circumstantial evidence pointing to the munition fired by Appellee Spire being the cause of his injury. This circumstantial evidence shows that Appellee Spire violated Sean's constitutional rights under the First, Fourth, and Fourteenth Amendments. The evidence also shows that there was a genuine issue of material fact in this case because Appellee Spire argued before the District Court that his munition did not hit Sean Stearns. This presents a material fact for the jury to determine, and therefore Summary Judgment was improper.

**2. Appellee Spire is not entitled to qualified immunity for Appellant's First Amendment retaliation claims (Counts I and II).**

To establish a First Amendment retaliation claim, Appellant must show (1) he was engaged in a protected activity, (2) that the Appellee's actions caused an injury to Appellant that would chill a person of ordinary firmness from continuing to engage in the activity, and (3) that a causal connection exists between the retaliatory

13

animus and the injury. *Bernini v. City of St. Paul*, 665 F.3d 997, 1007 (8th Cir. 2012). To establish this connection, Appellant must show that he was "singled out" because of his exercise of constitutional rights. *Id*. "A 'causal connection', i.e., retaliatory motive, is generally a jury question unless it is so free from doubt as to justify taking it from the jury." *See Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014).

Appellee very briefly addressed the first requirement, by stating a reasonable officer could conclude Stearns was no longer engaged in protected free speech when he failed to obey the command to disperse. Sean has testified he did not hear any warnings about munitions about to be shot and did not hear any order to disperse. (App. 620 R. Doc, 90-10 at 15).[20] Appellee cites Mo. Rev. Stat. § 574.060.1 in support of this position that Sean Stearns was not engaged in a protected activity. The statute states: a person commits the offense of refusal to disperse "if, being present at the scene of an unlawful assembly, or at the scene of a riot, he or she knowingly fails to refuse or obey the lawful command of a law enforcement officer to depart from the scene." (emphasis added). The record is clear that Appellant stated he did not hear any orders from law enforcement, and therefore did not knowingly fail to refuse or obey a lawful command. In the video no such command can be heard. The First Amendment protects the right to express frustration with a police department. *See Naucke v. City of Park Hills*, 284 F.3d 923 (8th Cir. 2002). At the

---

[20] Deposition of Appellant, 55:17-25

Appellate Case: 23-3448     Page: 19     Date Filed: 01/22/2024 Entry ID: 5355504

time Sean was struck, he was engaged in a protected activity, but he wasn't even expressing frustration with the police department because he was rendering aid to his partner. The first requirement can only be read in favor of Appellant Stearns.

Appellee does not address requirement #2 explicitly in submissions to the lower court as their entire motion, and section "I don't know what hit me", is based on arguing Appellee Spire did not cause the injury. However, as explained above, Appellant Stearns presented ample evidence that it was indeed Appellee Spire that blinded him. Further, all parties would agree that losing an eye while protesting would certainly chill a person of ordinary firmness from continuing to engage in First Amendment protests. Since losing his eye, Sean Stearns has not participated in another protest. (App. 623 R. Doc, 90-10 at 18.).[21]

With respect to requirement #3, in short, Appellee Spire's argument was that because he fired a chemical munition at a group, and did not specifically fire at Appellant, he did not *"single out"* Appellant. Put another way, Appellee Spire argued that because he targeted/"singled out" the crowd as a whole, that he cannot have retaliatory animus towards any one person in that group. Implicit in this argument is that if an officer uses a chemical munition that is meant to impact a group of people, it is impossible to be used with a retaliatory animus since this munition is not targeted at a "numerical" single person. This of course is not how

---

[21] Deposition of Appellant, 66: 9-15 (App. 623)

Appellate Case: 23-3448     Page: 20     Date Filed: 01/22/2024 Entry ID: 5355504

the court goes on to read "singled out" in *Green v. City of St. Louis*, when the court found a potential retaliatory animus when police gassed "she and others" that were leaving the vicinity of the protest. *Green v. City of St. Louis*, 52 S.4th 734 (8th Cir. 2022).

In the case at bar, Appellant Stearns, along with other peaceful protesters, had begun moving back and dispersing after handheld munitions were used. He was in a group of people that had either already left the street (as was the case with Sean) or were attempting to leave the street, which was in line with the strategic objective according to Major Daniel Gates. Appellee Spire agrees that the handheld munitions were starting to have their desired effect, that the handheld munitions moved protestors away from the line. (App. 321 R. Doc, 90-3 at 121.).[22] Protestors were still allowed to exercise their First Amendment right while in the park, yet Appellee Spire fired a munition at this group, i.e. singled out this group of people. Appellee Spire said in his statement to Lieutenant Culver that tracking three 40-millimeter projectiles into a specific target when they are launched is "very difficult" (App. 1013-1014 R. Doc, 101-10 at 7-8).[23] Appellee Spire did not know where the scat rounds would go, but he knew that they would be traveling at the specific group he

---

[22] Deposition of Appellee Spire, 121: 19-24 (App. 321)
[23] Statement of Appellee Spire, 20:19-25; 21:1-2 (App. 1013-1014)

Appellate Case: 23-3448    Page: 21    Date Filed: 01/22/2024 Entry ID: 5355504

targeted. Therefore, Appellee Spire "singled out" Appellant Stearns while he was exercising his First Amendment Constitutional right.

Appellee Spire finally argued that because *Green* had not been decided in May 2020, that Sean Stearns did not have a clearly established right to be free from the police retaliation of firing scat shells at peaceful protestors. For a right to be "clearly established," for purposes of qualified immunity defense in a civil rights action, the law must be sufficiently clear at the time of the officer's conduct that every reasonable officer would understand that what he is doing is unlawful. *Martinez v. Sasse*, 37 F.4th 506, 509 (8th Cir. 2022). The right to peacefully protest, as Sean Stearns was doing on May 30, 2020, without fear of retaliation by government, has been clearly established since the ratification of the Bill of Rights in 1791. A reasonable officer would understand that firing into a crowd at random is unlawful as evidenced by Sergeant Mathew Payne of the KCPD who testified "an officer wouldn't just fire into a crowd randomly. . ." because an officer first needs an identified target. (App. 589 R. Doc, 90-9 at 6.).[24] However, Appellee Spire has stated that he did just that, and didn't have a specific identified target. This munition is "not fired at a person. It is fired at a group. They're not target specific." (App. 247 R. Doc, 90-3 at 47.).[25]

---

[24] Deposition of Matthew Payne, 19:24-20:6 (App. 589)
[25] Deposition of Appellee Spire, 47: 6-9 (App. 247)

17

The Eighth Circuit has recently addressed a similar argument that indicates that there need not be a case directly on point in order to be clearly established. In *Quraishi v. St. Charles County, Missouri*, 996 F 3d 831, (8th Cir. 2021). In addressing the questions in a First Amendment context the Court stated:

> "Anderson insists that the law was not clearly established at the time of his alleged misconduct. "A citizen's right to exercise First Amendment freedoms without facing retaliation from government officials is clearly established." ***Baribeau***, 596 F.3d at 481. *See also* ***Hartman v. Moore***, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out."). "Official harassment of the press undertaken not for the purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification." ***Branzburg v. Hayes***, 408 U.S. 665, 707-08, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). True, the Eighth Circuit has not considered a case "directly on point" with the present facts—where reporters are arrested while peacefully filming a protest. *See* ***Ashcroft v. al-Kidd***, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). An exact match, however, is not required if the constitutional issue is "beyond debate." ***Id.*** Reporting is a First Amendment activity. *See* ***Branzburg***, 408 U.S. at 681, 92 S.Ct. 2646 ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."); ***New York Times Co. v. United States***, 403 U.S. 713, 717, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Black, J., concurring) ("In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy."). This court has denied qualified immunity to officers who arrested a man after he filmed and verbally challenged their conduct. ***Hoyland***, 869 F.3d at 655-58 (relying on the First Amendment). *See* ***Chestnut v. Wallace***, 947 F.3d

18

1085, 1090-91 (8th Cir. 2020) (denying qualified
immunity to officer who detained a man observing an
arrest), relying on Walker v. City of Pine Bluff, 414 F.3d
989, 992-93 (8th Cir. 2005) (recognizing as clearly
established the right to watch police-citizen interactions at
a distance and without interfering as of June 1998);
Thurairajah v. City of Fort Smith, 925 F.3d 979, 984-85
(8th Cir. 2019) (denying qualified immunity to officer who
arrested a man who drove by him during a traffic stop and
yelled an expletive), relying on Hartman, 547 U.S. at 256,
126 S.Ct. 1695 (recognizing as "settled" that the First
Amendment prohibits retaliatory actions against speech as
of 1988); Peterson, 754 F.3d at 603 (denying qualified
immunity to officer who pepper-sprayed arrestee after he
asked for a badge number); Small v. McCrystal, 708 F.3d
997, 1008-09 (8th Cir. 2013) (denying qualified immunity
to officers who arrested and prosecuted witnesses who
expressed verbal "displeasure" about an arrest); Copeland
v. Locke, 613 F.3d 875, 880 (8th Cir. 2010) (denying
qualified immunity because "[n]o reasonable police
officer could believe that he had arguable probable cause"
to arrest an individual for verbally challenging an officer
during a traffic stop); Gainor v. Rogers, 973 F.2d 1379,
1388 (8th Cir. 1992) (denying qualified immunity to
officers who arrested a man carrying a cross after he
argued with them).

*Quraishi v. St. Charles Cnty., Missouri*, 989 F.3d 831, 838-839 (8th Cir. 2021)

Much like Appellee Spire would not need specific caselaw stating he cannot

fire his service weapon indiscriminately into a crowd of protestors not knowing who

he would hit, Appellee Spire, or any reasonable officer, does not need specific

caselaw stating he was not allowed to fire other munitions directly at a group of

peaceful protestors without regard for who he would hit. A reasonable officer would

know that this is unlawful in any situation. Therefore, Appellee Spire is not entitled

Appellate Case: 23-3448     Page: 24     Date Filed: 01/22/2024 Entry ID: 5355504

to qualified immunity for Appellant's First Amendment claims because he violated his constitutional right to peacefully protest, and that right was clearly established. At a minimum, whether Appellee Spire had a retaliatory animus is a jury question, and thus Appellee Spire is not entitled to qualified immunity.

### 3. Appellee Spire does not have qualified immunity from Appellant's Fourth and Fourteenth Amendment excessive force claims

When a particular claim is not covered under the Fourth Amendment, or under another specific amendment, it is analyzed under the Fourteenth Amendment's guarantee of substantive due process. *County of Sacramento v. Lewis*, 490 U.S. 386, 395 (1989). To establish a violation of substantive due process, Appellant must show (1) that Appellee Spire violated one or more fundamental constitutional rights, and (2) that Appellee Spire's conduct was "shocking to the 'contemporary conscience.'" *Truong v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016). Under the conscience-shocking standard, the alleged substantive due process violations must involve conduct so disproportionate to the need presented, and so inspired by malice or sadism rather than merely careless or unwise excess zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience. *Dundon v. Kirchmeier* 577 F.Supp.3d 1007, 1061 (D.N.D 2021).

As discussed above, Sean Stearns has certainly met his burden showing that Appellee Spire violated Appellant's fundamental First Amendment right when

Appellee Spire used excessive force by firing indiscriminately into a group of protestors.

All force used by police officers must be objectively reasonable, which is informed by the totality of the circumstances known to the officer at the time they use the force. This is a sentiment that Appellee Spire agrees with. (App. 272 R. Doc, 90-3 at 72.).[26] However, in this case, the totality of the circumstances indicate that not only what Appellee Spire did was unreasonable, but also was a result of malice towards the protestors, and an inhumane abuse of his power based on the alleged physical and verbal abuse suffered by the officers in the hours and minutes prior.

Appellee Spire agreed that his use of force should be defined by the threat at the time he uses the force. (App. 219 R. Doc, 90-3 at 19).[27]

> Q. In other words, if there was a riot five minutes ago but
>    its not a riot anymore, you can't use force in the context
>    of it still being a riot; right?
> **A. That is correct.**

(App. 272-273 R. Doc, 90-3 at 72-73.).[28]

Appellee Spire agrees that the handheld munitions had their desired effect, in that they pushed protestors away from the line outside of throwable range. (App. 243 R. Doc, 90-3 at 43.).[29] Because protestors were outside of throwable range, they

---

[26] Deposition of Appellee Spire, 72:17-23 (App. 272)
[27] Deposition of Appellee Spire, 19:5-12 (App. 219)
[28] Deposition of Appellee Spire, 72:24-73:3 (App. 272-273)
[29] Deposition of Appellee Spire, 43:19 (App. 243)

21

were no longer posing any potential immediate threat to the officers on the line. "Immediate threat" is defined in Gas Grenadiers/Less Lethal Training as "an act that is occurring or accomplished without delay; instantly; and immediately jeopardizes the safety of the officer or other persons. (App. 1024 R. Doc, 101-12 at 4.).[30] Appellee Spire testified that chemical munitions must not be used against individuals unless they pose an imminent threat. (App. 247-248 R. Doc, 90-3 at 47-48.).[31] Appellee Spire has conceded that there was not an immediate threat, as the protestors were moved back, and without an immediate threat, the use of force through the firing of chemical munitions would be deemed unreasonable and excessive force. Even though classified as "less-lethal force", the munition can still cause serious injury or death. (App. 466 R. Doc, 90-8 at 37.).[32] Firing a munition that can cause serious injury or death, when absolutely no force is needed at the time, can only be classified as a brutal and inhumane abuse of power resulting from malice towards the group of protestors and the message or cause they are supporting.

When Appellant Stearn's group was fired upon, he had not committed a crime, was never arrested or charged with a crime, was not fighting or threatening anyone consistent with an imminent attack, had not committed any violent or tumultuous act, had not used force against anyone, had not created a hazardous or physically

---

[30] Gas Grenadiers/Less Lethal Training Power Point (App. 1024)
[31] Deposition of Appellee Spire, 47:19-48:1 (App. 247-248)
[32] Deposition of Police Chief Richard Smith, 37:17-21 (App. 466)

dangerous condition through any act that served no legitimate purpose, had not created any public inconvenience or alarm, had not assaulted or attempted to disarm any of the officers, had not injured any of the officers, had not assumed a shooting stance as he was rendering aid to Ms. Ragsdale, was not attempting to arm himself, had not assaulted any third person, and had not made any direct or indirect references to harming officers. There is only one reasonable explanation as to why Appellee Spire fired at Appellant's group, malice towards the protestors because of the message they were supporting.

Additionally, the Kansas City Regional Civil Disturbance Response Framework, updated in 2019, states: "less-lethal weapons and munitions should be used against specific individuals, based on articulable facts and circumstances perceived by the officer at the time. Less-lethal weapons and munitions should not be used indiscriminately against crowds and groups." (App. 1278 R. Doc, 101-14 at 12.). Unintentionally, Appellee Spire has admitted that he violated this framework by never identifying a specific target, and that he simply fired at a specific group. (App. 247 R. Doc, 90-3 at 47.).[33] While Appellee Spire claims this group was assaulting the police line with water bottles, that certainly was not the case when they had retreated after the original handheld smoke grenades were used and had their desired effect. The only evidence of abuse happening at the time Appellee Spire

---

[33] Deposition of Appellee Spire, 47: 7-9 (App. 247)

fired the munition is self-serving testimony and reports from KCPD and MSHP officers. Once the protestors came into compliance with any alleged orders, the use of force would be deemed unnecessary. Regardless, Appellee Spire fired a munition at a group of protestors posing no threat whatsoever to the police line, which is an inhumane abuse of power.

In *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012), the court held that officers were not entitled to qualified immunity for their use of force against Nelson. In *Nelson*, officers were dispatched to an apartment complex to break up a party. *Id*. The officers in *Nelson* were equipped with a pepperball gun which is in essence, a paintball gun that fires rounds containing oleoresin capsicum ("OC") powder. *Id*. These rounds are fired at a velocity of 350 to 380 feet per second. *Id*. After unamplified dispersal orders were given to the party with little to no compliance, the officer "shot pepperballs towards Nelson's group". *Id*. A pepperball launched from one of the officers' guns struck Nelson in the eye and resulted in temporary blindness and a permanent loss of visual acuity. *Id*.

In conducting an analysis of whether there was a violation of Nelson's Constitutional Rights, the court found that not only was Nelson seized pursuant to the Fourth Amendment, but also that "officers were advised not to shoot pepperballs indiscriminately or at individuals that were not posing a threat . . ." and "[a]lthough the officers encountered individuals at various points during their sweeps who threw

24

bottles or other debris at them . . . the Appellees admit that they never saw Nelson throw anything – in their direction or in any other direction." The same can be said of the case at bar.

Ultimately, the *Nelson* court states: "Under the factual circumstances present in this case, a reasonable officer would have been on notice that both the firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors, and the release of pepper spray in the area occupied by those individuals would constitute unreasonable force in violation of the Fourth Amendment." *Id*.

In short, while Appellee Spire may have felt "under attack" earlier in the night, he used that malice towards a group of peaceful protestors when he fired a scat shell randomly into a group of protestors. Appellee Spire cannot articulate a single justification for this use of force at the time he used this particular force. Appellee Spire has personally stated that "the rioters got past our throwable range." (App. 397 R. Doc, 90-4 at 2). The protestors were no immediate threat to anyone, and therefore, Appellee Spire's choice to fire a munition at the protestors, including Sean Stearns, cannot be characterized as anything but a brutal or inhumane abuse of power as a result of malice towards the group. Therefore, the District Court erred in granting Appellee Spire's Motion for Summary Judgment.

Appellate Case: 23-3448    Page: 30    Date Filed: 01/22/2024 Entry ID: 5355504

**B. Appellee Spire is not entitled to official immunity from Appellant's Missouri state claims. (Count VI).**

The Court of Appeals reviews a grant of summary judgment de novo; after reviewing the record in the light most favorable to the nonmoving party, the Court will affirm the decision if there are no genuine issues of material fact. *Jordan v. NUCOR Corp.*, 295 F.3d 828, 834 (8th Cir. 2002). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir. 1999); Fed.R.Civ.P. 56(c). Official immunity protection is available unless the employees' "conduct is willfully wrong or done with malice or corruption." *Kasiah v. Crowd Systems*, Inc., 915 F.3d 1179, 185 (8th Cir. 2019).

As briefed above, Sean Stearns has shown that Appellee Spire acted with malice towards a group of protestors when he fired a scat pack round directly at their location. Further, in MSHP's Investigative Summary, they note, "statements and evidence revealed that members of the Mobile Field Force detail, specifically, grenadiers [Appellee Spire and Trooper Dalton], deployed less-lethal munitions in a manner that was inconsistent with Patrol training and Special Order 16, Deployment of Chemical Agents / Irritants, section II-B, by: Deploying 40mm Skat Shell CS munitions aerially, over a crowd of people and Deploying 40mm gas and smoke munitions by intentionally firing them into the ground, towards their intended target area, absent exigent circumstances. (App. 873 R. Doc, 101-1 at 7.). This is a noted

26

direct violation of a policy; something Appellee Spire had no discretion to do. Additionally, the MSHP authorizes the use of less lethal weapons "when they reasonably believe it is necessary to protect themselves or others from physical harm." (App. 1135 R. Doc, 101-13 at 4.). However, as noted in MSHP's investigative summary, "[Appellee Spire did not] articulate any exigent circumstance to support the reasonableness of this technique/use of force." (App. 873 R. Doc, 101-1 at 7.).[34] Such a conclusion by his own department operates as a de facto admission that the manner of Spire's "less than lethal" deployment of CS gas was unconstitutional. Therefore, Appellee Spire is not entitled to official immunity from Appellant's Missouri state claims, and the District Court erred in granting Appellee Spire's Motion for Summary Judgment.

## C. The Police Board is not entitled to Summary Judgment on Appellant's Monell claims.

The Court of Appeals reviews a grant of summary judgment de novo; after reviewing the record in the light most favorable to the nonmoving party, the Court will affirm the decision if there are no genuine issues of material fact. *Jordan v. NUCOR Corp.*, 295 F.3d 828, 834 (8th Cir. 2002). Summary judgment is proper if there is no genuine issue of material fact, and the moving party is entitled to

---

[34] Missouri State Highway Patrol Investigative Summary Synopsis #14 (App. 873)

27

judgment as a matter of law. *Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir. 1999); Fed.R.Civ.P. 56(c).

**1. The Police Board's Policies and Procedures were deficient.**

A claim for a deficient, and nor non-existent policy, is established by showing three elements: (1) a continuing, widespread pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) proof that the custom or policy was the moving force behind the constitutional violation. *Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Alleging a single instance of misconduct is not sufficient to support inference of custom or unofficial policy of city for purposes of municipal liability under § 1983. *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003).

The policy and procedure for responding to a protest at the time of the protest stated: "when conditions so dictate and groups become disruptive or are endangering the lives and property of others, the primary police objective is to restore order. Violations of city ordinances or state and federal laws, that are not civil in nature, but criminal, will be handled accordingly." (App. 1405 R. Doc, 110-2 at 3.). This policy and procedure provides absolutely no guidance for what police conduct is allowed, or what the police response should be, and therefore is entirely deficient.

28

The policy has since been modified to include specific language and guidelines as to what is expected when members of the Kansas City community are exercising their First Amendment right. As explained below, the policy in place at the time of the George Floyd protest was entirely deficient and satisfies each element that must be established in order to proceed on this *Monell* claim.

The First Amendment protects the freedom of speech and assembly. After George Floyd's murder, Americans gathered to voice their displeasure with the police. This is a right and opinion that they are entitled to as American citizens. However, this Court does not have to look further than the events that transpired on the Plaza to see numerous constitutional violations from the KCPD and other agencies that they called to help. A few examples detailed below show a widespread pattern of unconstitutional conduct by officers in response to these demonstrations.

An example of unconstitutional excessive force being used occurs when the KCPD pulled a man out of a crowd for voicing his opinion, pepper sprayed him and his daughter, and then threw him on the ground to be handcuffed. The man briefly steps on the street to voice his opinion, and then back into the crowd. It is while he is in the crowd that the police walk up to him, grab and pepper spray him, and then retreat. He was not engaged in any criminal activity, had not thrown anything, and was simply exercising his First Amendment right.

29

Another example of unconstitutional excessive force is shown by police grabbing and pepper spraying a man with a bullhorn addressing fellow protestors. He has his back turned to the police, and he is unexpectedly taken, and pepper sprayed. (App. 797 R. Doc, 95-5 at 1.).

A final example is evidenced by a picture in the Kansas City Star which shows a police officer pepper spraying a man that is holding a sign above his head with both hands. (App. 799 R. Doc, 95-6 at 2.).

Additionally, Humberto Gonzalez's tibia and fibula were snapped when an officer shot a gas canister directly at him. Humberto went to the emergency room and required surgical repair of his leg.

These few examples show that there is a persistent pattern of unconstitutional misconduct in response to these protests. Further, these people were engaging in absolutely no criminal activity, but the responding officers decided to handle the situation "accordingly."

In addition to the number of incidents, the Court should also look to the timeframe in which they took place. This was a three-day period of time, in which at least four unconstitutional acts by officers occurred. The Court in *Tirado v. City of Minneapolis* was presented with the question of whether there was sufficient evidence to establish a custom when Appellant alleged a custom during the same George Floyd Protests in Minneapolis. *Tirado v. City of Minneapolis*, 521 F.Supp.3d

30

833, 842 (2021). In *Tirado*, "The Court finds that, although the timeframe of conduct alleged is isolated insofar as it is a defined period of time and a single continuous police operation, *Tirado* has sufficiently alleged that the City was on notice of the practice and thus, that the incident occurred over a sufficiently long period of time." *Id*. Therefore, the first element of inadequate policies is met.

"Deliberate indifference," for purposes of municipal liability under § 1983, requires that municipal actor disregard known or obvious consequence of his action. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).

In 2014, only six years before George Floyd's murder, the Ferguson protests in St. Louis took place. After that protest, national news covered multiple constitutional violations and shortcomings of the Ferguson Police Department based upon its policy and procedures. In the report authored by The U.S. Department of Justice, there are several "lessons learned" which are intended to be used as a guidebook for agencies across the county on how to prepare for and respond to mass demonstrations. (App. 822 R. Doc, 95-11 at 2.). Some lessons learned include: "Law enforcement agencies should develop comprehensive operational plans that include short-term response strategies that directly support long-term operational goals and "Use of equipment or weaponry should be restricted to limited situations that clearly justify their use. Policies and procedures should clearly state the limited situations for their deployment."

31

Despite a mass demonstration occurring only hours away, in 2017 the KCPD issued new policies and procedures for responding to protests/demonstrations and chose to exhibit a deliberate indifference to these suggestions, and simply stated that situations will be "handled accordingly." The Police Board was made aware of known consequences of not including specific language in their policy and they still wrote the policy to be open ended. There is nothing in the protest demonstrations/strikes policy that authorizes specific force to be used in specific situations, and the policy gives no guidance as to what steps need to be taken in order to protect constitutional rights. In other words, there is no comprehensive plan on how to address these situations. These shortcomings in the policies and procedures, tacitly authorized officers to use whatever force they might feel is necessary and provided no guidance as to what was constitutionally appropriate.

This in and of itself shows a deliberate indifference of the Police Board to make a specific policy addressing unconstitutional conduct by its employees. Additionally, "handl[ing] accordingly" only applies to crimes being committed. This was not the case for Appellant. Appellee's employees or their agents had no right to use the unlawful force as outlined above, and the KCPD has deliberately chosen to not write a comprehensive policy addressing protests, even after seeing the shortcomings of policies after Ferguson and other protests.

32

The deficient policies were the moving force behind Sean Stearns'
unconstitutional violations. Since there were no policies addressing how an officer
is supposed to respond to these protests, officers are given free range to decide for
themselves what force they are going to use. That is exactly the option Appellee
Spire was given and exactly what Appellee Spire did. Had a policy been in place that
specified what is expected of an officer, or what is constitutionally
allowed/unallowed in response to a protest, Appellee Spire would not have fired a
scat pack in the direction of Appellant when there was no immediate threat to the
officers.

### 2.  The Police Board's Failure to Train

To sustain a failure to train claim, Appellant must show: (1) The Police
Board's training practices were inadequate; (2) the Police Board was deliberately
indifferent to the rights of others in adopting its training practices; (3) the alleged
deficient training procedures actually caused Appellant's injury. *Andrews v. Fowler*,
98 F.3d 1069, 1076 (8th Cir. 1996). Appellant "must demonstrate that the [Police
Board] had notice that its procedures were inadequate and likely to result in a
violation of constitutional rights." *Parrish v. Ball*, 594 F3d 993, 997-98 (8th Cir.
2010).

Police Chief Richard Smith has testified as follows:

> Q. And to your understanding -- and you've  been chief
> since 2017 -- has there ever been any specific crowd

control, crowd management, civil unrest training that has
been conducted with KCPD and the Missouri State
Highway Patrol?
**A. Not that I know of.**

(App. 462 R. Doc, 90-8 at 33.).[35]

Certainly, Richard Smith acknowledging that crowd control, crowd management, or civil unrest training has not taken place in his time as police chief is more than enough evidence to show that The Police Board's training was entirely inadequate because it was actually nonexistent.

As a result of failing to train how to handle citizens exercising their First Amendment rights, The Police Board was deliberately indifferent to how responding officers would act in this situation. Protests are not new, and it is essentially a certainty that Americans will exercise the rights they are given. The Police Board knew this to be the case prior to 2020, yet failed to adopt any specific crowd control, crowd management, civil unrest training with KCPD the Missouri State Highway Patrol, or any other mutual aid agreement agency for that matter.

As outlined above, after protests, agencies issue several "lessons learned" in their reports. These lessons learned are based on other agencies mishandling situations that they dealt with during a specific protest. Another "lesson learned"

---

[35] Deposition of Police Chief Richard Smith, 33:9-14 (App. 462)

from Ferguson: "Law enforcement agencies should use the NIMS [National Incident Management System] model for a critical incident, particularly when there is a multiagency response. Agencies should not only adopt the NIMS operating model and meet certification standards but also regularly train and exercise with participating agencies. (App. 1442 R. Doc, 110-11 at 3.). This lesson learned was available to the Board years prior to the George Floyd protests, but the Board exhibited a deliberate indifference to the rights of others when they chose to not train on this issue by themselves or with other agencies. Had the KCPD trained with participating agencies, the officers would know what is expected during these situations.

Additionally, in 1999 at the World Trade Organization protests in Seattle occurred, and a "lesson learned" was: "mutual aid agreements need to include training together for events so agencies know what to expect and how to work together." Chief Smith agreed that this is a good idea but went on to acknowledge that the Board did not take any action to implement this at the Plaza. (App. 503 R. Doc, 90-8 at 74.).[36]

Because the Board deliberately chose not to train on these subjects, they were inherently indifferent as to how they would be handled by KCPD officers and other agencies that have mutual aid agreements.

---

[36] Deposition of Chief Richard Smith 74:10-11 (App. 503)

Lastly, the lack of training between the KCPD and other mutual aid agreement agencies actually caused Appellant's injuries for a few reasons. First, neither Appellee Spire, nor any other officer had been involved in a mass protest like the George Floyd protests. They were not trained on what to expect, or how to react during Americans exercising their First Amendment rights. Second, the responding officers did not know what was expected from them when they responded. Each officer was to handle situations "accordingly" but were never tasked with training on how to respond. Due to the lack of training, officers were to fend for themselves, and in this case, Appellee Spire used excessive force when he fired a scat round directly at a group of protestors. Finally, had the agencies trained together, Appellee Spire would have known the guidelines for using non-deadly force, and he would not have fired a scat pack in Appellant's direction. Appellee Spire was not attempting to protect himself or others from physical injury at the time he fired the round as the crowd "was outside throwing range" (at least 20 yards away) (App. 243 and 316 R. Doc, 90-3 at 43 & 116.).[37] Appellee Spire was not attempting to bring an unlawful situation safely and effectively under control. The video evidence, and Appellee Spire's testimony, show that handheld munitions were effectively and safely starting to control the protestors.[38]

---

[37] Deposition of Appellee Spire, 43:19 and 116:16-17 (App. 243 and 316)
[38] Deposition of Appellee Spire, 121:19-23 (App. 321)

Appellate Case: 23-3448     Page: 41     Date Filed: 01/22/2024 Entry ID: 5355504

As detailed above, The Police Board had multiple sources of information that dealt with the lessons police departments learned after dealing with protests. These sources are readily available via a google search, and they were authored after police departments made mistakes, including constitutional violations when responding to protests. The Police Board lacked both policies and procedures for its officers to follow at the time of the George Floyd protests, and never attempted to train for a response to a mass protest. Ultimately, these shortcomings led to Sean Stearns losing his eye and the District Court erred in granting The Police Board's Motion for Summary Judgment.

## **CONCLUSION**

Appellant has put forth ample evidence that indicates Appellee Spire fired the round that blinded him. Appellant has established that Appellee Spire acted with malice or a retaliatory motive towards the group of protestors as they were out of his throwable range, and that he targeted a specific group with this less-lethal munition because of the message they were protesting. At a minimum this would be a jury question precluding Summary Judgment in Appellee Spire's favor. Therefore, Appellee Spire is not entitled to qualified immunity, and the District Court was in error to grant the same.

Appellant has also met his burden to preclude Summary Judgment on Appellee Spire's official immunity defense because Appellant established that

37

Appellee Spire acted entirely inconsistent with the order that left Appellee Spire no discretion for his actions.

Similarly, Appellant has set forth a multitude of reasons as to why Appellee The Police Board was not entitled to Summary Judgment, and therefore Appellant requests this Court to overturn the District Court's Order and remand this matter for further proceeding including trial on the merits.


EDELMAN & THOMPSON, L.L.C.


By: _____*/s/ James T. Thompson*_____
James T. Thompson        MO #37245
4520 Main Street, Suite 500
Kansas City, Missouri 64111
Tel: (816) 561-3400
Fax: (816) 561-1664
jamesthompson@etkclaw.com

ATTORNEYS PLAINTIFF/APPELLANT

38

## CERTIFICATE OF COMPLIANCE

1. This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), this Brief contains 8,940 words.

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 point Times New Roman font.

3. This Brief and addendum have been scanned for viruses and are virus free. 8th Cir. R. 28 (A)(h).

EDELMAN & THOMPSON, L.L.C.


By: _____/s/ James T. Thompson_____
James T. Thompson          MO #37245
4520 Main Street, Suite 500
Kansas City, Missouri 64111
Tel: (816) 561-3400
Fax: (816) 561-1664
jamesthompson@etkclaw.com

ATTORNEYS PLAINTIFF/APPELLANT

39

## **CERTIFICATE OF SERVICE**

It is hereby certified that a copy of the above and foregoing document was filed and served via electronic transmission with the clerk of the court using the CM/ECF system on this 22nd day of January 2024. It is further certified that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

EDELMAN & THOMPSON, L.L.C.

By: _____*/s/ James T. Thompson*_____
James T. Thompson        MO #37245
4520 Main Street, Suite 500
Kansas City, Missouri 64111
Tel: (816) 561-3400
Fax: (816) 561-1664
jamesthompson@etkclaw.com

ATTORNEYS PLAINTIFF/APPELLANT